# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### Norfolk Division

|  |  |  |
|---|---|---|
| RHIANNON V. PARSONS, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civil Action No. 2:16cv743** |
| | : | |
| NANCY A. BERRYHILL, | : | |
| **Acting Commissioner,** | : | |
| **Social Security Administration,** | : | |
| | : | |
| **Defendant.** | : | |

## REPORT AND RECOMMENDATION

Plaintiff Rhiannon V. Parsons ("Plaintiff"), proceeding *pro se*, filed a complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). Plaintiff filed a Motion for Summary Judgment, ECF Nos. 12, 12-1, and a Memorandum of Law in Support, ECF Nos. 13, & 13, attach. 1.[1] The Commissioner filed a Cross-Motion for Summary Judgment and Memorandum of Law in Support. ECF Nos. 14–15. Both Motions are now ready for recommended disposition.

---

[1] The Court recognizes these documents as a Motion for Summary Judgment and Memorandum of Law in Support, respectively. However, Plaintiff does not make clear in these documents what she requests the Court to consider. Plaintiff's Motion for Summary Judgment merely includes a statement of her worsening condition and additional medical records from 2016–2017. ECF Nos. 12, 12, attach. 1. Her Memorandum of Law in Support only includes witness statements and one additional medical record. ECF Nos. 13, 13, attach. 1. As discussed herein, the Court construes these informal documents liberally as the Plaintiff filed *pro se*, and presumes she contests that substantial evidence supports the ALJ's decision, and is seeking remand of her case to the Commissioner for consideration of new evidence. *See* Part V., *infra*.

This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the Administrative Record and the briefs submitted by the parties, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 14, be **GRANTED**, the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Plaintiff initially filed her application for SSI on May 17, 2012, alleging disability due to anemia, chronic urinary tract infections, bipolar disorder, panic/anxiety disorder, arrhythmia, and chronic pain in her hands, knees, and back, with an alleged onset date of April 20, 2011. R. at 21, 23, 77, 213.[2] Her application was initially denied on October 26, 2012, R. at 112, and denied again upon reconsideration on December 19, 2013, R. at 126. Plaintiff then filed a request for a hearing with an administrative law judge ("the ALJ") on February 3, 2014. R. at 133. The ALJ, Stewart Goldstein, conducted a video hearing on August 12, 2015, at which Plaintiff appeared and testified. R. at 42. Also present were Plaintiff's father, who testified on Plaintiff's behalf, and a vocational expert ("VE"). R. at 43. On October 22, 2015, the ALJ issued a written decision denying Plaintiff's SSI application. R. at 18. On December 21, 2015, Plaintiff then filed a request with the Appeals Council for the Office of Disability and Adjudication ("Appeals

---

[2] "R." refers to the certified administrative record that was filed under seal on March 2, 2017, pursuant to Local Civil Rules 5(B) and 7(C)(1).

Council") to review the ALJ's decision. R. at 16. On October 28, 2016, the Appeals Council denied Plaintiff's request for review on the grounds that the ALJ did not abuse his discretion, there was no error of law, the ALJ's decision was supported by substantial evidence, and the case did not present a policy issue of public interest. R. at 1. Although, the Appeals Council considered the additional evidence submitted by Plaintiff, it determined that the additional information did not provide a basis for changing the ALJ's decision. R. at 2. Therefore, the ALJ's decision became the Commissioner's final decision. R. at 1.

On January 4, 2017, having exhausted her administrative remedies, Plaintiff, acting *pro se*, filed the instant Complaint for judicial review of the Commissioner's final decision. ECF No. 3. The Commissioner filed an Answer and the Administrative record, and the matter was referred to the undersigned for recommended disposition. ECF Nos. 8, 10. Plaintiff filed her Motion for Summary Judgment, ECF No. 12, and the Commissioner filed a Cross-Motion for Summary Judgment, a Memorandum in Support, and a *Roseboro* notice, ECF Nos. 14–16. The matter is now ripe for recommended disposition.

## II. RELEVANT FACTUAL BACKGROUND

Plaintiff alleged her disability onset date was April 20, 2011. R. at 21, 77. When Plaintiff filed her application for SSI on May 17, 2012, she was twenty-four (24) years old and had acquired her GED. R. at 31–32, 201–11. Plaintiff does not have consistent prior employment. R. at 201–11. Her work history consists of retail sales positions, all of which seemingly last less than one (1) year, R. at 67, 87, 201, as well as sporadic modeling performances in fashion shows, *see, e.g.*, R. at 475, 683. On August 12, 2015, Plaintiff testified before the ALJ at the administrative hearing and provided additional information. R. at 42–76.

Plaintiff resides in Hampton, Virginia with her father, whom she contends is severely disabled, R. at 46, 228, and her twin children, then age 5, R. at 46. Her daughter, ████████ has severe autism, and her son, ████ has ADHD and anger issues. R. at 57, 227. Plaintiff stated that both children receive SSI, and both attend regular doctor appointments and therapy sessions. R. at 46, 57–58. She is able, with the help of her father, to dress her children for their appointments and speak with doctors, and relies on both her father and fiancé to assist in getting the children to school. R. at 57–58. She attempts to help with housework and chores as much as possible, though she often needs help and encouragement to do so. R. at 24, 229. Plaintiff visits friends once a month, and goes to the movies twice a month at night in order to avoid crowds. R. at 59. She owns a computer, which she uses to access the Internet for websites like Facebook and YouTube. R. at 59. Plaintiff has a driver's license, but does not drive because she experiences panic attacks when doing so. R. at 48, 230. She experiences similar anxiety when in a crowded public place; for instance, when she goes grocery shopping with her fiancé. R. at 24, 49, 226.

At the time of the August 12, 2015 hearing, Plaintiff was prescribed Hydrocodone, Naproxen, and Cyclobenzaprine for pain. R. at 54. She stated that Cyclobenzaprine and Naproxen no longer provided pain relief, and the Hydrocodone was effective approximately twenty-five percent (25%) of the time. R. at 55. Plaintiff also testified that she experiences depression that makes it difficult for her to get out of bed, and periods of mania where she becomes angry and closed off. R. at 62. These manic periods can last between five (5) minutes and three (3) to four (4) hours, and can sometimes cause her to forget to eat. R. at 62–63, 228. Plaintiff claims she experienced a ten (10) pound weight loss due forgetting to eat or drink during manic periods, and "even when [she] thinks about food . . . [she will] get really nauseous

4

and [she will] feel like" she needs to throw up. R. at 63. Plaintiff also stated that during these manic episodes, she can become "really angry, to the point where [she] start[s] throwing things around the house, knocking things over, not wanting to be around anybody, trying to close [herself] off from everybody." R. at 62. Plaintiff also finds that sometimes transitioning from a sitting position to standing causes her to feel faint and black out. R. at 52. These black out episodes can last anywhere between fifteen (15) seconds and one (1) minute, though one time she experienced a black out for two (2) minutes. R. at 53, 714. During these episodes, Plaintiff sometimes falls to the ground or into walls or doors. R. at 54.

Ronald Parsons ("Mr. Parsons"), Plaintiff's father, also testified at the hearing. R. at 65–68. He testified that Plaintiff has "a false awareness of reality," and that her conditions are worse than she stated. R. at 65. Mr. Parsons indicated that he is taking care of Plaintiff's children, despite a recent heart attack. R. at 65. He stated that he believes Plaintiff is autistic, and shows similar symptoms to Plaintiff's mother, whose medical problems could not be diagnosed and who died at age thirty-eight (38) of a massive heart attack. R. at 66. Mr. Parsons testified that when he is able to procure a job for Plaintiff, "within a month she's calling [him] up freaking out" and he has to pick her up. R. at 67. He then reiterated the opinion of Dr. Mukesh Shah ("Dr. Shah"), Plaintiff's psychiatrist, that Plaintiff is incapable of working. R. at 68.

After the ALJ's decision, Plaintiff continued treatment at various medical facilities.[3] ECF Nos. 12, 12-1. She was subsequently diagnosed with Hypermobile Ehlers Danlos Syndrome on November 14, 2016, Postural Orthopedic Tachycardia Syndrome on December 27,

---

[3] According to records provided in Plaintiff's Motion, she visited VCU Medical Center Nephrology Division on November 14, 2016, ECF No. 12-1 at 18–22, December 27, 2016, ECF No. 12-1 at 12–15, January 31, 2017, ECF No.12-1 at 5–7, and March 20, 2017, ECF Nos. 12 at 6, 12-1 at 8–11. Plaintiff also visited Arthritis Consultants of Tidewater on March 16, 2017, ECF No. 12 at 10–14, Physical Medicine & Rehabilitation Clinic on January 19, 2017, ECF No.12-1 at 1–4, Hampton Family Medicine on July 21, 2017, ECF No. 12-1 at 16, and Riverside Cardiology Specialists on August 31, 2015, ECF No. 12 at 24–25.

2016, and Raynaud's Syndrome on March 20, 2017. ECF No. 13 at 2. She continued to seek treatment from her psychiatrist for anxiety after her August 12, 2015 hearing. R. at 762.

## A. Relevant Medical Records Regarding Physical Impairments

### 1. Primary Care Physician Dr. Linda Schneider

According to her medical records, Plaintiff was twenty-three (23) years old on April 20, 2011, her alleged disability onset date. R. at 21, 77. On May 17, 2011, about one month later, she sought treatment from Dr. Linda Schneider ("Dr. Schneider"), complaining of anxiety, pain, and allergies. R. at 434. Plaintiff claimed that the onset of her anxiety "was year(s) ago," and that the condition worsens with "stress and [l]oss of sleep." R. at 434. Dr. Schneider noted that Plaintiff relieved her symptoms through medication and counseling, and that Plaintiff was negative for panic attacks or suicidal ideation. R. at 434. Plaintiff described her physical pain as residing in her lower back, and that it was "an ache and sharp." R. at 434. Dr. Schneider's report states that the "symptoms are aggravated by daily activities" and "are relieved by stretching." R. at 434. At the time of the exam, the physician found that Plaintiff had regular heart rate and rhythm, with "no murmurs, gallops or rubs." R. at 435. Dr. Schneider also found that Plaintiff's balance, gait, and coordination were intact, and Plaintiff experienced no sensory loss or motor weakness. R. at 435.

On September 26, 2011, Plaintiff returned to Dr. Schneider for back pain and fatigue. R. at 431. Dr. Schneider found spinal tenderness and paravertebral muscle spasm, as well as periscapular trigger points. R. at 432. There was also "some audible crepitus" in her neck. R. at 432. However, Dr. Schneider noted that Plaintiff had no joint deformity and normal range of motion for her age, including normal range of motion in her neck. R. at 432.

6

On December 12, 2011, Plaintiff returned to Dr. Schneider for back pain. R. at 428. Plaintiff described the pain as "numbness and sharp[,]" and noted that the symptoms worsened "by changing positions, lifting, sitting and twisting." R. at 428. Pain medication provided some relief, but she had trouble sleeping despite taking her prescribed muscle relaxer, Cyclobenzaprine. R. at 428. During the appointment, Dr. Schneider found decreased lumbar mobility and tenderness, but no spasm. R. at 429. Plaintiff's results were also negative for a straight leg raising test. R. at 429. Dr. Schneider prescribed Ibuprofen and Tylenol. R. at 429.

On March 28, 2012, Plaintiff visited Dr. Schneider again for back pain, anxiety, and allergies. R. at 424. Dr. Schneider noted that at that time Plaintiff was prescribed Cyclobenzaprine and Ibuprofen as needed for pain. R. at 424. The physical exam showed regular heart rate and rhythm with no murmurs, gallops, or rubs. R. at 424. In a visit on June 5, 2012 for constipation and hemorrhoids, Dr. Schneider noted that Plaintiff was "negative for chest pain, claudication, edema and irregular heartbeat/palpitations . . . negative for anxiety, depression, [and] negative for back pain, joint pain and joint swelling." R. at 658.

On October 2, 2012, Plaintiff saw Dr. Schneider for hand spasms, back pain, and palpitations. R. at 653. The examination showed spasms along her cervical spine, thoracic spine, and lumbar spine, but full range of motion and no deformity in her elbows and hands. R. at 655. Plaintiff saw Dr. Schneider on November 14, 2012 for a burning sensation in the left side of her face. R. at 649. Her heart rate and rhythm during that examination were regular, with no murmurs, gallops, or rubs. R. at 651. On January 24, 2013, Plaintiff saw Dr. Schneider for cold symptoms and breast tenderness, R. at 645, at which time her heart rate and rhythm were regular, R. at 647.

7

On March 18, 2013, Plaintiff sought treatment for Gastroesophageal reflux disease ("GERD"). R. at 642. Another treating physician in Dr. Schneider's practice saw Plaintiff, and noted abdominal tenderness, but no distention. R. at 643. Plaintiff had a regular heart rate and rhythm, with no murmurs, gallops, or rubs. R. at 643. On July 16, 2013, Plaintiff returned to Dr. Schneider for back pain and chest discomfort. R. at 635. Her physical examination showed tenderness in Plaintiff's spine, with no spasm or deformity. R. at 635. Plaintiff continued to have normal range of motion. R. at 635. Plaintiff was tachycardic when sitting, which accelerated with strain and slowed to normal with lying down. R. at 635. Dr. Schneider treated Plaintiff conservatively, instructing her to avoid caffeine and to drink enough fluids to keep urine light in color. R. at 636.

## 2. *Sentara Port Warwick Emergency Department*

On October 14, 2011, Plaintiff went to Sentara Port Warwick Emergency Department ("the Emergency Department") for chest pain and anxiety "that started [that] morning while in court during a very stressful custody hearing." R. at 343, 346. The attending Physician's Assistant ("PA") ordered CK total and CKMB tests, which revealed a friction rub, though Plaintiff had a normal heart rate and rhythm and no gallop or murmur. R. at 348. An echocardiogram ("EKG") showed "normal sinus rhythm, no ectopy." R. at 349. She had normal range of motion, and normal gait and coordination. R. at 348, 351. The Emergency Department prescribed Lorazapem for anxiety, which was later cancelled by a nurse per "patient choice." R. at 351–52.

On February 8, 2012, Plaintiff returned to the Emergency Department for neck muscle strain, acute upper respiratory infections, and back pain. R. at 358–59. Plaintiff reported worsening neck and back pain over the previous two-week period, and that the pain was "severe

8

and associated with some nausea." R. at 360. She also reported experiencing anemia. R. at 363. During the physical exam, the PA found no lighted-headedness, dizziness, or other complaints that signified the Plaintiff had such a condition. R. at 363. The PA did find that Plaintiff had full range of motion in her neck and back, as well as regular heart rate and rhythm. R. at 361. Plaintiff showed normal affect and thought content. R. at 362. Imaging of Plaintiff's spine showed "some muscle spasm in cspine and osteophytosis of thoracic back, but no concerning osseous abnormalities." R. at 363. The PA prescribed Flexeril and Naprosyn for symptomatic relief. R. at 363.

On May 23, 2013, Plaintiff returned to the Emergency Department complaining of chest pain. R. at 592. On exam, Plaintiff had a normal heart rate and rhythm with no murmur, and full range of motion in all extremities. R. at 594. A chest x-ray showed "no acute cardiopulmonary process[,]" while an EKG noted sinus rhythm with ventricular premature complex. R. at 595.

*3. Cardiologist Dr. Eric Chou*

Plaintiff initially sought care from cardiologist Dr. Eric Chou ("Dr. Chou") in 2009. R. at 714. At that time, Dr. Chou did not find any "obvious cardiac etiology" for shortness of breath and irregular pulse. R. at 714. Plaintiff returned to Dr. Chou in 2011, referred by Dr. Schneider, for "ongoing palpitations, chest pain, and recurrent syncopal episodes." R. at 714. Dr. Chou ordered a stress test and a two-week event recorder. R. at 714. At the follow up appointment on July 28, 2012, Dr. Chou reviewed Plaintiff's stress echocardiogram from October 31, 2011, R. at 437, as well as the event recorder, R. at 303. The event recorder showed that Plaintiff experienced "some episodes of sinus tachycardia, but there [were] no prolonged pauses or other significant arrhythmias noted. There were no syncopal episodes." R. at 303. Additionally, "[t]he

9

stress echo was unremarkable." R. at 303. Based on these exam results, Dr. Chou determined that there was no primary cardiac etiology for Plaintiff's symptoms. R. at 303.

Plaintiff returned to see Dr. Chou on October 31, 2013 for the same symptoms she exhibited in 2011. Dr. Chou performed an EKG, the results of which showed a sinus arrhythmia. R. at 714. He then recommended another two-week event recorder "to evaluate for any significant arrhythmia causing her syncopal episodes." R. at 716. During the physical examination portion of the appointment, Dr. Chou found that Plaintiff had regular heart rate and rhythm. R. at 716. Because of the unremarkable results in cardiac testing, Dr. Chou attributed the cause of Plaintiff's concerns to anxiety and dehydration, and noted that if the repeated event recorder did "not show any significant arrhythmias, [he did] not think [he] would pursue any further cardiac testing" at that time. R. at 717.

### 4. *Urinary Tract Infections*

Plaintiff claimed in her SSI application that she experiences continuous urinary tract infections ("UTIs"). *See, e.g.*, R. at 319, 331, 383, 396, 417. Plaintiff went to Urgent Care for this problem on April 13, 2011, July 2, 2011, September 30, 2011, November 13, 2011 (at which time she was admitted to the emergency room), and March 20, 2012. *See* R. at 319, 331, 383, 396, 417. However, Dr. Schneider noted in September 2012 that "it is unclear . . . if [Plaintiff] is actually having urinary tract infections" as the only bacterial culture positive for infection on file was taken in August of 2007. R. at 528. Following a renal and urinary bladder ultrasound in 2012 to rule out wider health concerns, Plaintiff's renal functions and bladder were deemed normal. R. at 526–27.

10

## B. Relevant Medical Records Regarding Mental Impairments

### *1. Psychiatrist Dr. Mukesh Shah*

On April 20, 2011, Plaintiff had her first appointment with Dr. Mukesh Shah ("Dr. Shah"), Plaintiff's psychiatrist. R. at 501. During that visit, Plaintiff reported that she was diagnosed as bipolar when she was fifteen or sixteen years old, and at the time of diagnosis was prescribed Risperdal. R. at 501. Plaintiff continued use of this medication for approximately two (2) years. R. at 501. She claimed that the medication made her feel "like a zombie . . . so she decided to stop taking it . . . to see how she did without medications." R. at 501. Additionally, Plaintiff stated in the evaluation that in 2009, she visited her Primary Care Physician ("PCP"), whom this court assumes is Dr. Schneider, for insomnia and anxiety, which reportedly came on "in public places, and sometimes even at her home, where suddenly she would [start to experience] an increase in her heart rate and could not breathe." R. at 501. Plaintiff also reported that she had "given up her job in the past because of her anxiety spells at work[.]" R. at 501. The report states that Plaintiff's PCP prescribed Seroquel and Paxil in 2010 for her anxiety and mood symptoms. R. at 501. Although Plaintiff alleged an onset date of April 20, 2011, during the visit with Dr. Shah on this day Plaintiff denied any physical ailments. R. at 502. During the mental examination that accompanied that evaluation, Plaintiff was alert and oriented, her speech was spontaneous, and her thought process remained mostly goal-directed. R. at 502. She had occasional flight of ideas, and increased psychomotor activity. R. at 502. Her concentration was "okay" and her memory appeared "grossly intact." R. at 502. At the end of the evaluation, Dr. Shah assigned Plaintiff a Global Assessment of Functioning (GAF)[4] score

---

[4]"Clinicians use the GAF scale, devised by the American Psychiatric Association and ranging from zero to one hundred, to indicate an overall judgment of a person's psychological, social, and occupational functioning." *Delk v. Colvin*, No. 2:14-CV-505, 2015 WL 13021474, at *3 (E.D. Va. Apr. 16, 2015), report and recommendation adopted, No. 2:14CV505, 2015 WL 13022032 (E.D. Va. May 15, 2015), *aff'd*, 675 F. App'x 281 (4th Cir. 2017) (citing

of 55,[5] and increased Plaintiff's dosage of Seroquel.  R. at 503.

Plaintiff sought continued care with Dr. Shah from 2011 to the time of the hearing.  R. at 455–97, 504–10, 647–748.  On May 18, 2011, Dr. Shah noted that Plaintiff "report[ed] a definite improvement in her mood symptoms."  R. at 497.  Dr. Shah posited that Plaintiff's improvement might also have related to reduction in stress after winning her custody case.  R. at 497.  Plaintiff was alert and oriented, and made good eye contact.  R. at 497.  Her speech was coherent and relevant, her mood unremarkable, and her affect bright.  R. at 497.  Dr. Shah continued Plaintiff's prescriptions for Seroquel and Paxil.  R. at 497.

On August 8, 2011, Plaintiff reported that her medications might have been too strong, but that "she [was] doing well."  R. at 487.  Plaintiff was alert and oriented, made good eye contact, and her speech was "spontaneous, coherent and relevant."  R. at 487.  Her mood was unremarkable, and her affect bright.  R. at 487.  Dr. Shah reduced her prescriptions for Paxil and Seroquel.  R. at 487.  On November 17, 2011, Dr. Shah noted that Plaintiff reported was "doing well" but was "not taking Paxil as prescribed due to her having nausea from it."  R. at 473.  Her mood was stable, and she did not report any panic attacks.  R. at 471.  Plaintiff was alert, made good eye contact, and her speech was coherent and relevant.  R. at 473.  Her mood was

---

Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed. 2000)).  *See also Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017) ("[T]he fourth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") included a Global Assessment of Functioning scale on which to 'consider[ ] and rate[ ] [an individual's] psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness,' with a higher score indicating an increased level of functioning.  The more recent edition of the DSM, however, abandoned the use of GAF scoring, noting 'its lack of conceptual clarity' and 'questionable psychometrics in routine practice.'  After the DSM-V was published, the Social Security Administration issued a directive to its ALJs in July 2013, instructing them to still consider GAF scores as medical opinion evidence but emphasizing that GAF scores should not be considered in isolation." (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013)).

[5] Patients with occasional panic attacks are given a symptom score in the interval 51-60 (moderate symptoms), and patients with conflicts with peers or coworkers and few friends, a functioning score in the interval 51-60 (moderate difficulty in social, occupational or school functioning).  IH Monrad Aas, *Global Assessment of Functioning (GAF): Properties and Frontier of Current Knowledge*, 9 ANNALS OF GEN. PSYCHIATRY 1–2 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2880316/pdf/1744-859X-9-20.pdf.

unremarkable and her affect bright. R. at 471. Plaintiff continued her prescriptions for Paxil and Seroquel. R. at 471.

On February 9, 2012, Plaintiff attended her appointment with her father and twins. R. at 466. She reported "spells of anxiety, where she gets a significant increase in her heart rate, shortness of breath, and chest pain." R. at 466. Plaintiff's father inquired about the possibility of Plaintiff having Asperger's syndrome. R. at 466. Dr. Shah did not notate his opinion about this assertion. *See* R. at 466. She reported getting easily overwhelmed when taking care of her children. R. at 466. Plaintiff reportedly continued her medication as prescribed. R. at 466. She was alert and oriented, made good eye contact, and her mood was unremarkable. R. at 466. Dr. Shah removed Paxil from Plaintiff's medications, and introduced Zoloft. R. at 466. Plaintiff continued her use of Seroquel. R. at 466. On March 7, 2012, Dr. Shah noted that Plaintiff "denie[d] any side effects from the current dosage" of Zoloft. R. at 463. On examination, Plaintiff was alert and oriented, made good eye contact, and had relevant and coherent speech. R. at 463. Dr. Shah continued Plaintiff's prescriptions for Zoloft, Xanax, and Seroquel. R. at 463.

In Dr. Shah's May 2, 2012 medication evaluation, Plaintiff reported that she was "definitely doing better" and only had to use Xanax one time in two months. R. at 459. She maintained a stable mood and experienced adequate sleep. R. at 459. Plaintiff reported that "she remain[ed] busy taking care of her twins." R. at 459. Dr. Shah continued Plaintiff on her medications. R. at 459. In his July 11, 2012 quarterly medication evaluation, Dr. Shah reported that Plaintiff maintained stability and used Xanax only one time in three months. R. at 455, 675. She denied any sleep disturbance and side effects from her medications. R. at 455, 675. Her mood was unremarkable and her affect was bright. R. at 455, 675. Plaintiff's speech was

13

coherent, she had fair eye contact, and her judgment appeared intact. R. at 455, 675. Dr. Shah reported continued use of her medications (Seroquel, Zoloft, and Xanax), as well as individual counseling. R. at 455.

On October 1, 2012, Dr. Shah noted that Plaintiff "maintained stability during [that] review period. She denie[d] any side effects from her medications." R. at 671. Plaintiff was alert and oriented, made good eye contact, and had a "friendly" mood and bright affect. R. at 671. She continued her prescriptions of Zoloft and Seroquel. R. at 671. On November 19, 2012, Plaintiff reported increased stress due to having to find a new place to live and taking care of her father. R. at 688. Plaintiff was alert and oriented, with coherent and relevant speech. R. at 688. Her mood was unremarkable, "however, she did talk about some of her anxiety and sadness due to increased stress." R. at 688.

On February 15, 2013, Dr. Shah's progress notes show that Plaintiff was doing "reasonably well," and that she required minimal use of Xanax over the prior three-month period. R. at 696. Plaintiff's mood was unremarkable, her speech coherent and spontaneous, and she showed fair judgment. R. at 696. In an appointment with another physician in Dr. Shah's office on May 17, 2013, Plaintiff's mood was "stressed," but she spoke spontaneously and had good eye contact. R. at 704. She reported trouble sleeping, and more frequent use of her Xanax. R. at 704. She continued Seroquel, Zoloft, and Xanax. R. at 705. On July 17, 2013, Plaintiff reported she was "doing reasonably well at [that] time." R. at 712. She was alert and oriented, made good eye contact, and had coherent and relevant speech. R. at 712. Her mood was unremarkable and her affect bright. R. at 712. Plaintiff continued her medications. R. at 712.

On January 17, 2014, Plaintiff attended her appointment with her father and daughter. R. at 746. She stated that she was "not doing well at all" without her medication. R. at 746. Dr. Shah noted that Plaintiff's father asked him to write a letter attesting to Plaintiff's ability to work, and Dr. Shah opined in his patient notes that Plaintiff could not "return to work at [that] time or in the next twelve (12) months." R. at 746. Plaintiff was alert and oriented, but seemed overwhelmed. R. at 746. She allowed her father to take care of her daughter when she became disruptive, and Plaintiff did not intervene with her father's discipline. R. at 746. Plaintiff's speech was coherent and relevant, though her mood was "dysphoric" and affect "tense to a degree." R. at 746. Plaintiff agreed to retry a higher dose of Zyprexa (though the record is unclear when Plaintiff was prescribed Zyprexa prior to this appointment), as well as Xanax. R. at 747. She received a GAF score of 45. R. at 747. On January 23, 2014, Dr. Shah wrote a letter stating that Plaintiff's bipolar diagnosis would not allow her to work for the next twelve (12) months.[6] R. at 719.

On February 21, 2014, Plaintiff reported that she was "doing reasonably well." R. at 743. She was alert and oriented, made some eye contact, and had coherent and relevant speech. R. at 743. Her mood was unremarkable and affect appropriate. R. at 743. She continued her medication, and had a GAF score of 51. R. at 743. During her May 15, 2014 visit, Plaintiff reported she was "not doing well." R. at 740. She experienced increased stress due to the behavioral issues of her children. R. at 740. She was alert and oriented, had coherent and relevant speech, and interacted appropriately with her son, who attended the appointment with her. R. at 740. Her mood was "dysphoric to a degree" and her affect "tense." R. at 740. She was assigned a GAF score of 51. R. at 740.

---

[6] In the letter, Dr. Shah stated that Plaintiff had been under his care since April 20, 2001. R. at 719; ECF No. 12, attach. 1 at 23. However, the Record indicates that the first time Dr. Shah treated Plaintiff was her initial alleged onset date of April 20, 2011. R. at 501.

On August 8, 2014, Plaintiff stated that she remained "in significant stress" due to her children, and that she was having trouble falling asleep. R. at 738. She was oriented and alert, with fair eye contact. R. at 738. Her speech was coherent, spontaneous, and relevant, and her "affect [was] appropriate to her mood and thought content." R. at 738. Her mood was "stressed out, however, she denie[d] any significant depression." R. at 738. Dr. Shah continued her medications, and assigned her a GAF score of 55. R. at 738. On December 12, 2014, Plaintiff reported she was "doing much better." R. at 735. Plaintiff was alert and oriented, with coherent and relevant speech with some spontaneous conversation. R. at 735. Her mood was "okay" and he affect "restricted, but appropriate." R. at 735. Dr. Shah assigned Plaintiff a GAF score of 60–65 at the end of the appointment, and continued her prescriptions for Zyprexa and Xanax. R. at 735.

In her March 10, 2015 appointment, Plaintiff reported that she was not doing well, and that experienced more anxiety "with increased heart rate, shortness of breath, [and] some chest discomfort, along with some nausea." R. at 727. She reported being afraid to leave her home, and that public places worsened her condition. R. at 727. Dr. Shah noted that Plaintiff was alert and oriented, and her speech was spontaneous, coherent, and relevant. R. at 727. He reported her mood as "anxious" and her affect "tense." R. at 727. At the end of the appointment, Dr. Shah assigned Plaintiff a GAF score of 55–60. R. at 727. She continued her use of Zyprexa, with an increased dosage, and Xanax, and Dr. Shah introduced Celexa. R. at 727.

Dr. Shah wrote a second letter about Plaintiff's inability to work on July 21, 2015, R. at 754, and another regarding her psychiatric history on August 21, 2015, R. at 757. On August 26, 2015, fourteen (14) days after the ALJ hearing, Plaintiff visited Dr. Shah again, reporting that she was "doing okay." R. at 762. She experienced some stress, and an increased use of her

16

Xanax, but her sleep and appetite had been fair. R. at 762. Plaintiff had spontaneous, coherent, and relevant speech. R. at 762. Her mood was "sad and anxious to a degree" and her affect "appropriate." R. at 762. She received a GAF score of 60–65. R. at 762.

### 2. Therapist Dr. R.G. Mahan

Plaintiff began individual therapy with Dr. R.G. Mahan ("Dr. Mahan") on March 4, 2011. R. at 453, 510–11. Dr. Mahan's initial report states Plaintiff complained of anxiety and stress due to legal issues regarding the custody of her children. R. at 510. Plaintiff reported that her anxiety led to "manic or hypomanic episodes." R. at 510.

From March 4, 2011 to June 15, 2011, Plaintiff attended four (4) therapy sessions. R. at 493–96, 499–500, 504–11. In those appointments, generally Plaintiff reported fewer depression symptoms, increased anxiety due to her pending custody case, and minimal manic moments. R. at 493–96, 499–500, 504–11. Plaintiff's quarterly progress review for that time period shows that she "seem[ed] a lot better and the medicine seem[ed] to be helping." R. at 493. Her mania and anxiety was "better for the most part but" still occurred once per day, and seemed to be "co-concurring." R. at 493.

Between June 15, 2011 and August 29, 2011, Plaintiff attended therapy sessions with Dr. Mahan three (3) times. R. at 485–92. During these appointments, Plaintiff reported that her depression responded well to medication, and that her anxiety increased with personal stressors. R. at 489. At his quarterly review of that period, Dr. Mahan noted that Plaintiff's depression had "gradually improved and she report[ed] being more positive most of the time." R. at 483. Plaintiff also reported that her anxiety had not gotten worse, and "though the intensity is the same, the duration has become less . . . and she feels like she handles it better." R. at 483. Her mania had improved, and she made strides with her interpersonal relationships. R. at 483.

17

Plaintiff visited Dr. Mahan four (4) times between August 29, 2011 to November 30, 2011. R. at 474–84. In those meetings, Plaintiff reported lessened depression which was helped by medication, and bouts of anxiety that were not assisted by medication. R. at 474–84. In his quarterly review of Plaintiff's progress during those dates, Dr. Mahan noted that she reported "no depression over the past three months[,]" but that she "becomes anxious about twice a day due to her situational stressors from the children, appointments, health issues for her dad and daughter, visitation issues and custody concerns." R. at 471. Dr. Mahan also noted that Plaintiff reported manic episodes up to four (4) times per week. R. at 471.

On December 8, 2011, Dr. Mahan reported that Plaintiff was "upbeat and in a good mood. Not depressed today." R. at 470. Plaintiff reported occasional anxiety that sometimes made her sick. R. at 470. She stated that her medication was helping her depression, but not her anxiety. R. at 470. At that time, Plaintiff planned to start college once her children were in school, and to volunteer in order to gain work experience. R. at 470. On January 9, 2012, Plaintiff's progress notes report some depression and anxiety over the holidays. R. at 465. She experienced manic periods, and used "furious cleaning to dispel it." R. at 465. Plaintiff reported that Seroquel and muscle relaxers helped her sleep. R. at 465.

At her Annual Progress Review on March 13, 2012, Dr. Mahan reported that Plaintiff's depression had improved, and medication changes had helped. R. at 461. Plaintiff continued to report occasional and short anxiety issues, but noted reduced frequency, duration, and intensity of manic periods. R. at 461. Plaintiff believed that her medication was helping. R. at 461. In his March 13, 2012 to June 22, 2012 Progress Review Summary, Dr. Mahan's notes state that Plaintiff experienced "some anxiety off and on due to the number of appointments she has for herself, the twins and her father." R. at 456, 676. Plaintiff stated that the anxiety "[o]nly lasts

18

for a little while and then goes away." R. at 456, 676. She reported feelings of mania up to three (3) times a week over the three (3) month period. R. at 456, 676. She reported no interpersonal issues "with people outside the home and she and [boyfriend] John [were] doing well in their relationship." R. at 456, 676. Plaintiff was compliant with her medication, and it seemed to be helping. R. at 456, 676.

In her September 2012 therapy progress review, Plaintiff reported that the review period was more "stressful during the 'getting ready for school time frame.'" R. at 672. With her children in school, Plaintiff had more time to relax and reported less stress. R. at 672. Her mania had leveled out, and had not experienced interpersonal issues. R. at 672. Plaintiff visited Dr. Mahan three (3) times between September 11, 2012 and April 19, 2013. R. at 683–94. Plaintiff cancelled or did not attend six (6) additional appointments during that period. R. at 686–99. Generally, Plaintiff reported that she continued to have panic attacks and manic episodes, but was medication compliant. R. at 683–687.

In April 2013, Plaintiff's therapy progress notes indicate that her medications were "working well most of the time." R. at 700. Her anxiety and sleep were better, though she reported increased stress related to her "paramour joining the military and them getting married," as well as with difficulties having her children remain asleep at night. R. at 700.

On December 23, 2014, Plaintiff began seeing Dr. Candice Jenkins ("Dr. Jenkins") for therapy. R. at 734. In January of 2015, Plaintiff's progress notes with Dr. Jenkins indicated that she was overwhelmed, but she was able to help this feeling with "organizing and learning to take time for herself." R. at 733.

## C.  State Agents' Determination Prior to ALJ Hearing

In order to determine whether Plaintiff qualified for SSI benefits, the Commissioner arranged for Plaintiff to be evaluated through a record review by state agents in a Disability Determination in 2012.  R. at 77–89.  When the Commissioner denied her claim and Plaintiff requested reconsideration, the state performed a second Disability Determination in 2013.

### 1. First Disability Determination Explanation

On October 26, 2012, Dr. Sreeja Kadakkal ("Dr. Kadakkal"), a state psychiatrist reviewing Plaintiff's case, filed a Disability Determination Explanation which led to the initial denial of her claim.  R. at 77–89.  The report concluded that Plaintiff had mild restriction of activities of daily living ("ADLs"), mild difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no repeated episodes of decompensation.  R. at 82.  In her credibility assessment of Plaintiff, Dr. Kadakkal found that Plaintiff was partially credible because the:

> [r]ecords show no limitations with talking or hand usage other than decreased grip strength . . . [h]er ADLs are not limited in her ability to play with her children, count change, handle household chores and prepare meals.  Her mental allegations of memory, completing tasks, concentration, following instructions, and getting along with others are credible but not to disabling level.  [S]he can still handle daily activities and care for her children.

R. at 83.

Dr. Kadakkal determined that Plaintiff was not significantly limited in her ability to carry out simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual; to sustain an ordinary routine without special supervision; and to make simple work-related decisions.  R. at 86.  Plaintiff was moderately limited in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to work with

others without being distracted; and to "complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." R. at 86.

Dr. Kadakkal assessed Plaintiff's work history, and found that despite Plaintiff's lack of past relevant work, "this information [was] not material because all potentially applicable Medical-Vocational Guidelines would direct a finding of 'not disabled' given the individual's age, education, and RFC. Therefore, the individual can adjust to other work." R. at 87. Plaintiff was assigned a Residual Functioning Capacity ("RFC") of "light." R. at 87.

A second state physician, Dr. William Amos ("Dr. Amos"), found that Plaintiff's RFC allowed her to lift or carry twenty (20) pounds occasionally, and ten (10) pounds frequently. R. at 84. She was able to sit, stand, or walk for about six (6) hours of an eight (8) hour workday. R. at 84. She had "unlimited" ability to push and pull, could frequently climb stairs, and could occasionally climb ladders or scaffolding. R. at 84. Plaintiff had unlimited ability to balance, and could occasionally stoop, kneel, crouch, or crawl. R. at 84–85. Dr. Amos found that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or to understand and remember very short and simple instructions. R. at 85. He found that Plaintiff had moderate limitations in her ability to understand and remember detailed instructions. R. at 85. Dr. Amos attributed Plaintiff's memory limitations to her bipolar disorder and anxiety diagnoses. R. at 85.

The first Disability Determination Explanation notes that Plaintiff was not significantly limited in her ability to interact appropriately with the general public; to ask simple questions or for assistance; to accept instruction and respond appropriately to criticism; or to maintain socially appropriate behavior and adhere to neatness and cleanliness standards. R. at 86.

21

Plaintiff was moderately limited in her ability to get along with coworkers without distracting them or "exhibiting behavioral extremes[.]" R. at 86.

## 2. Second Disability Determination Explanation

Upon reconsideration of Plaintiff's evidence, the state again found Plaintiff was not disabled on December 19, 2013. R. at 108. Plaintiff alleged a worsening of her conditions after the initial determination that included "an increase in pain and swelling in her hands, arms and knees. She [was] having problems grasping objects with her hands. She also report[ed] an increase in her neck and back pain . . . [and] in her anxiety and panic attacks." R. at 92. This second report concluded that Plaintiff had mild restriction of ADLs, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. R. at 101. Dr. Leslie Montgomery ("Dr. Montgomery"), a state psychologist, performed the same credibility assessment of Plaintiff's statements as Dr. Kadakkal, with the same result. R. at 102–03.

The second evaluating physician, Dr. Tony Constant ("Dr. Constant"), found that Plaintiff's RFC allowed her to lift or carry fifty (50) pounds occasionally, and twenty-five (25) pounds frequently. R. at 103. She was able to sit, stand, or walk for about six (6) hours of an eight (8) hour workday. R. at 103. Dr. Constant based this on his findings that Plaintiff had "[m]uscle spasms in the spine and hands at times, without evidence of loss of strength and sensitive in the joints, with diffuse general pain in joints, and she is thin with BMI of 16, with normal urological and abdominal examinations and imaging. Stress and anxiety are a factor." R. at 104. Dr. Constant found that Plaintiff could frequently climb stairs, and occasionally climb ladders or scaffolding. R. at 84. Plaintiff could frequently balance, stoop, kneel, or crouch, and

occasionally crawl. R. at 104. She had frequent, but not constant, limitations with reaching overhead, and unlimited manipulation in handling, fingering, and feeling. R. at 104.

## D. Medical Records Submitted After the ALJ Hearing

After the ALJ's decision, Plaintiff continued treatment at various medical facilities.[7] ECF No. 12. She was subsequently diagnosed with Hypermobile Ehlers Danlos Syndrome on November 14, 2016, Postural Orthopedic Tachycardia Syndrome on December 27, 2016, and Raynaud's Syndrome on March 20, 2017. ECF No. 13 at 2.

Hypermobile Ehlers Danlos Syndrome ("hEDS") is "an inherited connective tissue disorder that is caused by defects in a protein called collagen. It is generally considered the least severe form of Ehlers-Danlos syndrome (EDS) although significant complications can occur." National Center for Advancing Translational Sciences, *Hypermobile Ehlers-Danlos syndrome: Summary*, Genetic and Rare Diseases Information Center (last updated Apr. 20, 2017), https://rarediseases.info.nih.gov/diseases/2081/ehlers-danlos-syndrome-hypermobility-type. The symptoms often include "joint hypermobility, affecting both large (elbows, knees) and small (fingers, toes) joints; soft, smooth skin that may be slightly elastic (stretchy and bruises easily); and chronic musculoskeletal (muscles and bones) pain[,]" among less frequent others.[8] *Id.*

Postural Orthopedic Tachycardia Syndrome ("POTS") is "a condition characterized by too little blood returning to the heart when moving from a lying down to a standing up position

---

[7] According to records provided in Plaintiff's Motion, she visited VCU Medical Center Nephrology Division on November 14, 2016, ECF No. 12, attach. 1 at 18–22, December 27, 2016, ECF No. 12, attach.1 at 12–15, January 31, 2017, ECF No. 12, attach. 1 at 5–7, and March 20, 2017, ECF Nos. 12 at 6, ECF No. 12, attach. 1 at 8–11. Plaintiff also visited Arthritis Consultants of Tidewater on March 16, 2017, ECF No. 12 at 10–14, Physical Medicine & Rehabilitation Clinic on January 19, 2017, ECF No.12, attach. 1 at 1–4, Hampton Family Medicine on July 21, 2017, ECF No. 12, attach. 1 at 16, and Riverside Cardiology Specialists on August 31, 2015, ECF No. 12 at 24–25.

[8] *See* National Center for Advancing Translational Sciences, *Hypermobile Ehlers-Danlos syndrome: Symptoms*, Genetic and Rare Diseases Information Center (last updated Apr. 21, 2017), https://rarediseases.info.nih.gov/diseases/2081/ehlers-danlos-syndrome-hypermobility-type. Additionally, the site offers additional symptoms and the frequency with which Orphanet, a European rare disease database, people with this condition have reported these symptoms. *Id.*

(orthostatic intolerance).  Orthostatic intolerance causes lightheadedness or fainting that can be eased by lying back down."  National Center for Advancing Translational Sciences, *Postural orthostatic tachycardia syndrome: Summary*, Genetic and Rare Diseases Information Center (last updated Jan. 23, 2017), https://rarediseases.info.nih.gov/diseases/9597/postural-orthostatic-tachycardia-syndrome.  Additional symptoms may include "a rapid increase in heart rate[,]" as well as headache, poor concentration, tiredness, and anxiety.[9]  *Id.*

Raynaud's Syndrome (or Raynaud's phenomenon) "is a condition that affects your blood vessels.  If you have Raynaud's phenomenon, you have periods of time called 'attacks' when your body does not send enough blood to the hands and feet."  National Institutes of Health, *Raynaud's Phenonmenon*, National Institute of Arthritis and Musculoskeletal and Skin Diseases (last updated Oct. 30, 2016), https://www.niams.nih.gov/health-topics/raynauds-phenomenon.  Attacks occur when a person is cold or stressed, and the person's "fingers and toes may feel very cold or numb."  *Id.*

Plaintiff asserts that she has had these conditions all her life, but was unable to have them diagnosed or treated due financial hardships and lack of Medicaid funding.  ECF No. 13 at 2.  She requests that these additional diagnoses, and the medical records that attend them, ECF No. 12, be included in her medical history for evaluation of her case, ECF No. 13.

### III.  THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

The ALJ conducts a five-step sequential analysis of a claimant's work and medical history in order to determine if the claimant is eligible for benefits.  20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  On judicial review, the Court

---

[9] Additional symptoms have been reported in people with POTS. *See* National Center for Advancing Translational Sciences, *Postural orthostatic tachycardia syndrome: Symptoms*, Genetic and Rare Diseases Information Center (last updated Feb. 1, 2017), https://rarediseases.info.nih.gov/diseases/9597/postural-orthostatic-tachycardia-syndrome.

examines whether the ALJ applied the correct legal standard during this sequential analysis, and whether the resulting final decision of the Commissioner is supported by substantial evidence in the record.  The ALJ must determine if:

> (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.

*Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability.  Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law: First, the ALJ found that Plaintiff did not engage in substantial gainful activity pursuant to 20 C.F.R. § 416.971 *et seq.*  R. at 23.  Second, the ALJ determined that of Plaintiff's complaints, the bipolar disorder, anxiety/panic disorder, arrhythmia, and fibromyalgia "significantly limit [Plaintiff's] ability to perform basic work activities and are consequently severe." R. at 23.  The ALJ discounted "all other impairments alleged and found in the record, including anemia, chronic urinary tract infections, and hypermobility," as they are non-severe, are "responsive to medication, do not require any significant medical treatment, [and] do not result in any continuous exertional or non-exertional functional limitations." R. at 23.

Third, the ALJ determined that the evidence failed to show that Plaintiff has "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt P, App. 1." R. at 23 (citing 20 C.F.R. §§ 416.920(d), 416.925, and 416.926). The ALJ assessed each of Plaintiff's "severe" impairments individually: Plaintiff's arrhythmia under section 4.05 in Appendix 1 (4.00 Cardiovascular System); fibromyalgia under sections 1.00 (Musculoskeletal System), 11.00 (Neurological System), 14.00 (Immune System), and 12.00 (Mental Disorders) (pursuant to SSR 12-2p for the Evaluation of Fibromyalgia); and bipolar disorder and anxiety/panic disorders under 12.04 and 12.06, respectively. R. at 22–23. The ALJ found that for both Plaintiff's arrhythmia and fibromyalgia, the conditions, singularly or in combination, did not meet the severity required by the Code of Federal Regulations because "they are not attended . . . with the specific clinical signs and diagnostic findings required to meet or medically equal any listing." R. at 23.

The ALJ performed an additional analysis using the "paragraph B" criteria to determine the severity of Plaintiff's mental impairments. R. at 24. To satisfy the paragraph B criteria, a mental impairment must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. 20 C.F.R. Pt. 404, Subpt P, App. 1. The ALJ found that Plaintiff experienced only mild restriction on her activities of daily living, and moderate difficulties in maintaining social functioning. R. at 24. He also found that, while Plaintiff reports experiencing significant difficulties dealing with stress and change, as well as with memory and concentration, the record shows no marked limitation in social functioning of concentration, persistence, or pace. R. at 24. Thus, the ALJ found that Plaintiff experienced moderate difficulties in this area of mental functioning. Finally, the ALJ found that Plaintiff

experienced no episodes of decompensation. R. at 25. Accordingly, the ALJ determined that the "paragraph B" criteria were not satisfied. R. at 25.

Fourth, from the above evaluation, the ALJ determined that Plaintiff possesses the RFC necessary to perform light work as defined in Social Security Administration Vocational Considerations, 20 C.F.R. §§ 404.1567(b), 416.967(b), subject to the following limitations: Plaintiff cannot climb ladders, ropes, or scaffolds, or work around hazards such as dangerous machinery or unprotected heights, and cannot perform work at a production rate pace. R. at 25. Plaintiff can perform frequent climbing of ramps and stairs, stooping, kneeling, crouching, and crawling, and can perform simple routine tasks where she does not have to interact with coworkers or the public on more than an occasional and superficial basis. R. at 25.

To reach this conclusion, the ALJ performed a two-step process in order to evaluate Plaintiff's symptoms: determining (1) whether there is an underlying medically determinable physical or mental impairment (whether "an impairment . . . can be shown by medically acceptable clinical and laboratory diagnostic techniques"), and (2) the level of intensity, persistence, and limiting effects of Plaintiff's symptoms. R. at 26. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. R. at 26. However, the ALJ determined that Plaintiff's statements regarding the limiting effects of her symptoms, and the statements of her witnesses, are unsupported by Plaintiff's medical records. R. at 26–27.

If the statements regarding the limiting effects of the impairments are not substantiated by objective medical evidence, the ALJ must "make a finding on the credibility of the statements based on a consideration of the entire case record." R. at 26. The ALJ found Plaintiff's statements to be only "partially credible" because Plaintiff's treatment for pain has been

conservative, primarily consisting of medications. R. at 27. Despite her history of cardiac complaints, Plaintiff has not required hospitalization, her physical exams show no evidence of a disabling cardiac impairment, and her cardiac workups are consistently unremarkable. R. at 27. Plaintiff's mental impairments have been treated "entirely conservative[ly] consisting of routine outpatient medication management and therapy." R. at 28. Her patient progress notes "show varying symptoms, but overall positive response to treatment." R. at 28. The ALJ found that Plaintiff's GAF scores "have been indicative of only moderate impairment[,]" and "the claimant's activities suggest greater functioning than she now alleges." R. at 29–30.

Further, the ALJ considered the opinion evidence provided by Dr. Shah and Dr. Mahan in the record, a letter written by her fiancé John Cross ("Mr. Cross"), the ALJ hearing testimony of Mr. Parsons, and the opinions of Dr. Kadakkal, Dr. Amos, Dr. Montgomery, and Dr. Constant. R. at 30. Following his evaluation of the each witness's credibility, the ALJ accorded no weight to the opinion of Dr. Shah or Dr. Mahan because, while they indicated that Plaintiff is mentally ill and unable to work, the visit notes from both providers "do not support these statements . . . [and] are inconsistent with the claimant's conservative treatment history and activities during the adjudicatory period." R. at 30–31. The ALJ afforded only partial weight to statements made by Mr. Parsons, and Mr. Cross, concluding that the statements made by both Mr. Cross and Mr. Parsons were not impartial, and "[we]re inconsistent with other evidence of record such as progress notes indicating that claimant has been relatively stable with conservative mental health treatment, has done better with psychotropic medication, and has had few abnormalities on mental status examination." R. at 31. The ALJ accorded significant weight, however, to the State agency psychological consultants' opinions that reported only moderate mental limitations, and that the "claimant can perform light-level work as this is consistent with the objective

medical signs and the longitudinal record." R. at 31. He accorded little weight to the finding at

reconsideration that Plaintiff could perform "medium" work because the additional evidence did

not support that finding. R. at 31. The ALJ noted that Plaintiff had no past relevant work and

therefore, transferability of job skills was not an issue when determining what work Plaintiff

could perform. R. at 32.

Fifth, the ALJ found that there were jobs in the national economy Plaintiff could perform

with her conditions based on the testimony of VE Edith Edwards ("Ms. Edwards"). R. at 32.

The ALJ offered the following hypothetical to Ms. Edwards for her evaluation:

> I'd like you to assume the existence of a hypothetical individual with this claimant's age, education, and no past relevant work experience. She is a younger individual with a GED, the equivalent of a high school education, and no past work experience, as I indicated. I'm going to limit her to exertionally light work. However, she can't climb ladders, ropes, or scaffolds. She can't work around hazards, or dangerous machinery, or unprotected heights. She can frequently climb ramps and stairs; and frequently stoop, kneel, crouch, and crawl. I'm also going to limit her to performing only simple, routine tasks where she does not have to interact with co-workers or the public on more than an occasional and superficial basis. I'm also going to add no work at a production rate pace as you would typically find on an assembly line or in piece work.

R. at 72–73.

After the ALJ posed this hypothetical to Ms. Edwards, she testified that there were jobs

in the national market at the light and sedentary levels that Plaintiff could perform. R. at 73.

Ms. Edwards provided examples of such light positions such as office helper and clerical

checker. R. at 73. At the sedentary level, Ms. Edwards posited that Plaintiff could perform jobs

such as inspector of electronics, or sorter/examiner. R. at 74. The ALJ then inquired what

percentage of being "off-task" is allowed in these occupations for a person to sustain the job. R.

at 74. Ms. Edwards state that in her professional opinion, if a person is less than ten percent

(10%) off task, she could sustain these jobs. R. at 74. She continued that if the person was ten

percent (10%) off task, it was a borderline situation where there may or may not be work

depending on the particular job, and above ten (10) percent off-task, there is no work. R. at 74. The ALJ clarified by asking if he added "that she was off task more than 10 percent there would be no job she could do?" R. at 75. Ms. Edwards confirmed that this was "correct for these unskilled example[s] . . . and similar jobs like [them]." R. at 75. The ALJ found that Ms. Edwards's testimony was consistent with the information provided in the Dictionary of Occupational Titles ("DOT") pursuant to SSR 00-4p. R. at 32.

From this testimony and his evaluation of Plaintiff's medical records, the ALJ concluded that, "[c]onsidering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform," and again listed the position examples provided by Ms. Edwards. R. at 32. Thus, the ALJ determined that Plaintiff was not disabled as defined by the Act, and Medical Vocational Rule 202.20, at any time from May 17, 2012, the alleged onset date, through August 12, 2015, the date of the ALJ hearing. R. at 32–33.

## IV. STANDARD OF REVIEW

The Act limits the Court's review of the Commissioner's final decision to determining whether substantial evidence supports the decision in the record and whether the ALJ applied the correct legal standard in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "reweigh conflicting evidence, make credibility determinations, or

30

substitute our judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 1996) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).   If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).   Accordingly, if the Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).   Additionally, this Court may not consider evidence that was not before the Commissioner at the time of the decision. *See Miller v. Barnhart*, 64 F. App'x 858, 859 (4th Cir. 2003) (citing *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996)); *see also United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15 (1963) ("the reviewing function is one ordinarily limited to consideration of the decision of the agency or court below and of the evidence on which it was based.").

## V. ANALYSIS

An individual is considered disabled under the Act, and therefore entitled to receive SSI benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c (a)(3)(B).   In her Motion for Summary Judgment, Plaintiff does not expressly contest the ALJ's decision, but seems to request "a Reconsideration and an extension of time to the present date to include medical documentation of a Genetic Disorder and other genetic syndromes that [she has] been recently diagnosed with." ECF No. 13 at 2.   The documents that Plaintiff filed as her Motion are simply medical records regarding Plaintiff's

31

diagnoses with hEDS, POTS, and Raynaud's Syndrome, which she obtained between November 2016 and November 2017. ECF Nos. 12, 12, attach. 1. Her Memorandum in Support only includes witness statements regarding Plaintiff's health and one additional medical record. ECF Nos. 13, 13, attach. 1.

As noted, the Court is not clear whether Plaintiff by her Motion meant to challenge the ALJ's decision based on the evidence he considered in the record. *See* ECF No. 12. However, a *pro se* litigant is "entitled to a liberal construction of her pleadings." *Miller v. Barnhart*, 64 F. App'x 858, 859 (4th Cir. 2003) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). *See also L.H. v. Colvin*, No. 2:15cv382, 2016 WL 3883030, at *9 (E.D. Va. 2016). This Court will therefore construe Plaintiff's informal Motion and Brief in Support as seeking remand on the basis of "new evidence." *Miller v. Barnhart*, 64 F. App'x 858, 859 (4th Cir. 2003) (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)). This Court will also construe Plaintiff's Motion as questioning the correctness of the ALJ's decision, and will assess that decision "to determine whether it contains any errors of law and is supported by substantial evidence in the record." *L.H. v. Colvin*, No. 2:15cv382, 2016 WL 3883030, at *9 (E.D. Va. 2016).

## A. Plaintiff's Evidence Does Not Meet the Requirements to Submit "New" Evidence to the Appeals Council.

In her Motion, Plaintiff provides evidence and medical records from 2016 and 2017, evidence that the ALJ did not have at the time of his decision. ECF No. 12. Previous Fourth Circuit cases instruct that courts "may remand a case to the Commissioner on the basis of new evidence if four prerequisites are met[.]" *Miller v. Barnhart*, 64 F. App'x 858, 859 (4th Cir. 2003) (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)) (also known as a "sentence six remand," as it refers to the Court's ability to remand the decision based on the sixth sentence of § 405(g)). These prerequisites are that:

(1) the evidence must be relevant to the determination of disability at the time the application(s) was first filed;

(2) the evidence must be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her;

(3) there must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and

(4) the claimant must make at least a general showing of the nature of the new evidence to the reviewing court.

*Miller v. Barnhart*, 64 F. App'x 858, 859–60 (4th Cir. 2003) (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)).

The Court believes that the gravamen of Plaintiff's Motion is her assertion that the Appeals Council should have considered her additional evidence because it is "new and material." Presumably, Plaintiff requests this Court remand her case in order to include these additional documents in the administrative level of review. *See* ECF No. 12. The Commissioner argued in response that the evidence attached to Plaintiff's Complaint is neither "new" nor "material," and Plaintiff did not establish good cause for why she did not present this evidence to the ALJ. ECF No. 15 at 21–22.

Under *Borders*, arguably, Plaintiff can show good cause for not submitting the evidence prior to the decision. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985). Plaintiff did not receive the diagnoses of these conditions until after the ALJ's decision. *See* ECF No. 12. In *L.H. v. Colvin*, the court held that good cause existed for plaintiff's failure to submit certain evidence prior to the ALJ's decision "[b]ecause the assessment occurred after both the ALJ and the Appeals Council considered this matter." *L.H. v. Colvin*, No. 2:15cv382, 2016 WL 3883030, at *16 (E.D. Va. June 21, 2016); *see also Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (noting that there was good cause for the plaintiff's failure to submit the evidence earlier because she had not yet had the procedure that provided the evidence). Plaintiff also made the requisite

showing of the nature of the new evidence by attaching the medical records and diagnoses to her Motion. ECF No. 12. *See Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing *Huffer v. Heckler,* 591 F. Supp. 626, 628 (S.D. Ohio 1984) (noting that the plaintiff made a general showing of the nature of the evidence to be submitted on remand where the plaintiff submitted hospital records of her surgery)). However, Plaintiff must meet all four criteria in order for this Court to remand this case for the Appeals Council to review Plaintiff's new evidence. As discussed below, Plaintiff cannot meet the relevancy and materiality standards set out in *Borders*.

*1.  Plaintiff's evidence does not meet the relevancy standard*

In order for the evidence to be "relevant to the determination of disability at the time the application was first filed," *Miller v. Barnhart*, 64 F. App'x 858, 859–60 (4th Cir. 2003) (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)), the evidence must relate back to the time period considered by the ALJ, *L.H. v. Colvin*, No. 2:15cv382, 2016 WL 3883030, at *16 (E.D. Va. 2016) (finding that "[a]lthough describing an assessment performed well after the ALJ's decision, the additional evidence arguably relates back to the period before the decision as it recites a history of [Plaintiff's] condition and behavior."). Additionally, "it must not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Campbell v. Colvin*, No. 2:11cv563, 2013 WL 1213062, at *8 (E.D. Va. Mar. 1, 2013).

Plaintiff's "new" evidence shows that she was recently diagnosed with hEDS, POTS, and Raynaud's Syndrome. ECF No. 12. The assessments from which these new diagnoses are derived occurred after the ALJ made his decision; however, Plaintiff claims she has had these conditions her entire life. ECF No. 13 at 2. The medical records submitted to the Court do not refer to an onset date for these conditions. *See* ECF No. 12 *passim*. Thus, construing the

34

evidence in favor of Plaintiff, the Court will assume the new diagnoses do not concern evidence of a "later-acquired disability." *Campbell v. Colvin*, No. 2:11cv563, 2013 WL 1213062, at \*8 (E.D. Va. Mar. 1, 2013).

The other prong of *Campbell*, however, prohibits the submission of evidence of a "subsequent deterioration of a previously non-disabling condition." *Campbell v. Colvin*, No. 2:11cv563, 2013 WL 1213062, at \*8 (E.D. Va. Mar. 1, 2013). Plaintiff claims she has had these conditions her entire life, ECF No. 13 at 2, and that they have worsened since the determination by the ALJ. *See* ECF No. 12 at 10; ECF No. 12, attach. 1 at 12. The symptoms Plaintiff complained of during the hearing before the ALJ would then have been evidence of these conditions. After his review of Plaintiff's testimony and her medical records, the ALJ specifically considered all of Plaintiff's symptoms and conditions and determined that they did not amount to a designation of "disabled." R. at 33. Therefore, Plaintiff's medical record evidence simply shows, at most, a "subsequent deterioration of the previously non-disabling condition." *Campbell v. Colvin*, No. 2:11cv563, 2013 WL 1213062, at \*8 (E.D. Va. Mar. 1, 2013). Accordingly, the Court finds then that Plaintiff's evidence does not meet the relevancy standard enunciated by the *Borders* court. *See Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985).

## 2. *Plaintiff's evidence is not material*

Even if Plaintiff's evidence is relevant to determination of the disability at the time of the decision, Plaintiff must also meet the materiality requirement. The "new" evidence is material if the Commissioner's "decision might reasonably have been different had the new evidence been before her." *Miller v. Barnhart*, 64 F. App'x 858, 859–60 (4th Cir. 2003) (citing *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985)). The evidence cannot be "duplicative or

35

cumulative." *Wilkins v. Sec'y, Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)).

In her initial claim for SSI, Plaintiff alleged that she experienced chronic chest palpitations and back pain, heart arrhythmia, and anxiety/panic disorder. R. at 21, 23. As stated above, the symptoms that follow hEDS include, in relevant part, "chronic musculoskeletal (muscles and bones) pain." National Center for Advancing Translational Sciences, *Hypermobile Ehlers-Danlos syndrome: Summary*, Genetic and Rare Diseases Information Center (last updated Apr. 20, 2017), https://rarediseases.info.nih.gov/diseases/2081/ehlers-danlos-syndrome-hypermobility-type. Additionally, POTS causes lightheadedness or fainting, as well as a rapid increase in heart rate, headache, poor concentration, tiredness, and anxiety. National Center for Advancing Translational Sciences, *Postural orthostatic tachycardia syndrome: Summary*, Genetic and Rare Diseases Information Center (last updated Jan. 23, 2017), https://rarediseases.info.nih.gov/diseases/9597/postural-orthostatic-tachycardia-syndrome. With such similar symptoms, Plaintiff's chest palpitations and arrhythmia may be a result of POTS. POTS may also contribute to her anxiety disorder. Her chronic pain may be attributed to hEDS and Raynaud's syndrome.

However, the ALJ found that the symptoms Plaintiff experienced prior to his decision were not disabling. R. at 33. Rather than identifying new conditions, these diagnoses simply place a new label on previous symptoms that were presented to and considered by the ALJ. The evidence Plaintiff provided after the hearing is therefore cumulative of the information the ALJ had at the time of his decision. *Pallett v. Astrue*, No. 3:09CV819, 2010 WL 2696283, at *6 (E.D. Va. May 27, 2010) *report and recommendation adopted,* No. 3:09-CV-819, 2010 WL 2696653 (E.D. Va. July 7, 2010) (finding the newly presented evidence immaterial because "the

evidence supplied by Plaintiff was merely cumulative insofar as the physicians' opinions are based upon the same objective evidence already considered by the ALJ"). Consequently, the Court finds that the new evidence is not material because "it would not reasonably have changed the Commissioner's decision had it been before her." *Miller v. Barnhart*, 64 F. App'x 858, 860 (4th Cir. 2003).

The Court finds, therefore, that Plaintiff's additional evidence does not meet two of the four required criteria provided by *Borders* that necessitates a reviewing court remand a case to the Commissioner. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985).

**B. Substantial Evidence Supports the ALJ's Decision.**

There is substantial evidence in the record to support the ALJ's decision. As noted in Part III, *supra*, the ALJ cited extensively from the record in support of his determinations, pointing to specific entries demonstrating the extent of her impairments. R. at 27-31. Further, as the Court detailed in Part II, *supra*, the entirety of Plaintiff's medical records support the ALJ's conclusion that her impairments are not disabling. On review, it is not this Court's duty to second-guess the ALJ's judgment as long as it is supported by substantial evidence in the record. *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2). Plaintiff's physical examinations consistently, with few exceptions, showed normal heart rate and rhythm with no gallops or murmurs, and when noted, normal musculoskeletal movement and full range of motion. *See generally* R. at 270–630. Her test results from cardiology appointments show no "cardiac etiology" for her symptoms. R. at 303, 714. She continues to be treated conservatively with pain medications, and advised to stretch, ECF No. 12 at 13, or eat foods with high salt content, ECF No. 12, attach. 1 at 10.

Plaintiff's mental examinations also support the ALJ's decision that she is not disabled. On several visits to Dr. Shah, Plaintiff was deemed to be "alert and oriented," had "coherent speech," and had a "bright affect." *See generally* R. at 455–97, 504–10, 647–748. Additionally, Dr. Shah consistently assigned Plaintiff a GAF score of fifty (50) or more. *See, e.g.*, R. at 503, 727, 747. Further, the ALJ noted that Plaintiff continued to care for her children and perform housework. R. at 24, 59. She often "kept busy" with the care of her father, and continued to grocery shop with her fiancé despite an increase of her anxiety in crowds. R. at 49, 229. She "furiously" cleans her house her to dispel manic episodes. R. at 465. Plaintiff is able to visit friends and periodically go to the movies. R. at 59. Based on this evidence, the ALJ did not err in finding these conditions are not disabling. Therefore, even if Plaintiff's conditions have worsened since the hearing, the labeling of these conditions as reflected by Plaintiff's Motion and Memorandum in Support, ECF Nos. 12–13, presents evidence of a "subsequent deterioration of the previously non-disabling condition," but does not warrant remand. *Williams v. Colvin*, No. 3:13cv173–HEH, 2014 WL 1248031, at *10 (E.D. Va. Mar. 25, 2014) (quoting *Szuhak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984) (holding that evidence that merely shows the "subsequent deterioration of the previously non-disabling condition" does not warrant a sentence six remand)).

The additional records also contain findings that appear to reflect mild impairments with little to no additional restrictions on activities. ECF No. 12. For example, at Plaintiff's March 16, 2017 visit to Arthritis Consultants of Tidewater, the physician found only "mildly restricted rotation" of the cervical spine and normal rate and rhythm of the heart. ECF No. 12 at 12–13. Similarly, at a January 19, 2017 visit to the Physical Medicine & Rehabilitation Clinic, the attending physician found normal heart rate and rhythm and normal range of musculoskeletal

motion. ECF No. 12 at 19. Both physicians recommended conservative treatment for Plaintiff's issues, ECF No. 12 at 13, 19–20, which mimic previous examinations and treatments, *see, e.g.*, R. at 54, 424.

Consequently, the Court finds that substantial evidence in the record supports the decision of the ALJ.

## VI.  RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, the Commissioner's Motion for Summary Judgment, ECF No. 14, be **GRANTED**, and the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

The Court notes that while Plaintiff's newly submitted evidence cannot be considered in this case, Plaintiff may file a new claim with a new onset date where such evidence may be relevant. 20 C.F.R. § 416.330(b). The Court expresses no opinion, however, as to the merits of any such claim.

## VII.  REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen (14) days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to mail a copy of this Report and Recommendation to *pro se* Plaintiff and forward a copy of the same to counsel for the Commissioner.

LAWRENCE R. LEONARD
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 22, 2018